AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
Electronic devices seized by the Montgomery County )
Sheriff's Office from 3980 North Haven Way in Harrison )
Township, Ohio on November 12, 2015 )

Case No. **3:16 mj-006**

**SHARON L. OVINGTON**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-3

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B-3

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attachment C-3 | |

The application is based on these facts:
See Attached Affidavit

☐ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Andrea R. Kinzig, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1-7-16

_____
*Judge's signature*

City and state: Dayton, Ohio

Sharon L. Ovington, Chief U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A-3**

The property to be searched is Electronic devices seized by the Montgomery County Sheriff's Office from 3980 North Haven Way in Harrison Township, Ohio on November 12, 2015 (the "Devices"). The Devices are more fully described as follows:

    a.  Kyocera cellular telephone, Model C5215 (no visible serial number)
    b.  Huawei cellular telephone, Model U8500, serial number (S/N) P5K7NA1261100087
    c.  Motorola Razor cellular telephone, S/N SJUG2147DK
    d.  Apple iPhone, FCC#BCG-E2599A
    e.  Apple iPhone, FCC#BCG-A1303B
    f.  Apple iPhone, FCC#BCG-E2599A
    g.  Cricket ZTE cellular telephone (no visible serial number)
    h.  Apple iPad, S/N F9GN8DJ8F196
    i.  HP laptop computer bearing serial number 5C0444DGF4
    j.  LG tablet
    k.  HTC cellular telephone, S/N FAA49TSR14682
    l.  LG cellular telephone, S/N 205KPTM0483393
    m.  Samsung cellular telephone, DEC number 268435460208229767
    n.  Samsung cellular telephone, S/N 02212905459
    o.  LG Tracfone, S/N 912CQYQ748746
    p.  LG Net10 cellular telephone, 806CQPY643520
    q.  Samsung T-Mobile cellular telephone, S/N R21D754TXGW
    r.  Samsung Verizon cellular telephone, S/N SMB311VZPP

The Devices are currently located in the Evidence Room of the Montgomery County Sheriff's Office, 345 West Second Street, Dayton, Ohio, 45422.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B-3.

**ATTACHMENT B-3**

1.    All records on the Devices described in Attachment A-3 that relate to violations of involving (1) Interstate Transportation of Stolen Vehicles, in violation of 18 U.S.C. §2312; (2) Interstate Sale or Receipt of Stolen Vehicles, in violation of 18 U.S.C. §2313; (3) Interstate Transportation of Stolen Goods, in violation of in violation of 18 U.S.C. §2314; (4) Interstate Sale or Receipt of Stolen Goods, in violation of 18 U.S.C. §2315; (5) Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §922(g); (6) Possession of Controlled Substances, in violation of 21 U.S.C. §844; (7) Tampering with a Witness, Victim, or Informant, in violation of 18 U.S.C. §1512(b); (8) Conspiracy, in violation of 18 U.S.C. §§371 and 1349; and (9) Wire Fraud, in violation of 18 U.S.C. §1343, from January 1, 2015 to the present, including:

   a.  Any communications regarding the theft, transportation, sale, or receipt of stole vehicles and other items;

   b.  Any communications regarding the possession, acquisition, and use of controlled substances;

   c.  Any communications regarding the possession, acquisition, and use firearms;

   d.  Any communications regarding the tampering with or intimidation of a witness, victim, or informant in a criminal proceeding;

   e.  Any contact / identifying information for individuals involved in the communications about the above noted offenses;

   f.  Any Internet searches regarding the theft, transportation, sale, or receipt of stolen vehicles and other items;

   g.  Any Internet searches regarding the possession, acquisition, and use of controlled substances;

   h.  Any Internet searches regarding the possession, acquisition, and use firearms;

   i.  Any maps, directions, GPS information, IP addresses, and other location information related to the execution of the above noted offenses;

   j.  Any images and/or videos depicting stolen vehicles and other items, controlled substances, firearms, or surroundings where the acquisition, transportation, or disposition of the above noted items transpired.

2.    Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

   As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

## Attachment C-3

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §2312 | Interstate Transportation of Stolen Vehicles |
| 18 U.S.C. §2313 | Interstate Sale or Receipt of Stolen Vehicles |
| 18 U.S.C. §2314 | Interstate Transportation of Stolen Goods |
| 18 U.S.C. §2315 | Interstate Sale or Receipt of Stolen Goods |
| 18 U.S.C. §922(g) | Possession of a Firearm by a Prohibited Person |
| 21 U.S.C. §844 | Possession of Controlled Substances |
| 18 U.S.C. §1512(b) | Tampering with a Witness, Victim, or Informant |
| 18 U.S.C. §§371 and 1349 | Conspiracy |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Andrea R. Kinzig, being duly sworn, depose and state the following:

## INTRODUCTION

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been so employed since 2005. I am currently assigned to the Dayton, Ohio Resident Agency of the Cincinnati Field Office. In connection with my official duties, I investigate violations of federal criminal laws, including offenses pertaining to interstate transportation, sale, and receipt of stolen vehicles; the illegal possession of firearms; and the illegal possession of controlled substances.

2. Along with other agents and officers of the Montgomery County (Ohio) Sheriff's Office and various state and local law enforcement agencies, I am currently involved in an investigation of interstate theft, firearms, and controlled substances offenses committed by MERLE LUNSFORD and his associates. This Affidavit is submitted in support of Applications for search warrants for the following:

   a. Information associated with telephone numbers **937-641-9736, 937-838-8173,** and **937-430-7982** that is stored at premises controlled by T-Mobile (as more fully described in Attachment A-1);

   b. Information associated with telephone number **937-559-6115** that is stored at premises controlled by AT&T Wireless (as more fully described in Attachment A-2);

   c. Electronic devices seized by the Montgomery County Sheriff's Office from 3980 North Haven Way in Harrison Township, Ohio on November 12, 2015 (as more fully described in Attachment A-3);

   d. **Alcatel One Touch Cellular Telephone bearing Model 5054N and IMEI 014451001214013** (as more fully described in Attachment A-4);

   e. **Garmin GPS device bearing serial number 145-01615-10** (as more fully described in Attachment A-5).

3. The purpose of these Applications is to seize evidence of the following offenses: (1) Interstate Transportation of Stolen Vehicles, in violation of 18 U.S.C. §2312; (2) Interstate Sale or Receipt of Stolen Vehicles, in violation of 18 U.S.C. §2313; (3) Interstate Transportation of Stolen Goods, in violation of in violation of 18 U.S.C. §2314; (4) Interstate Sale or Receipt of Stolen Goods, in violation of 18 U.S.C. §2315; (5) Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §922(g); (6) Possession of Controlled Substances, in violation of 21 U.S.C. §844; (7) Tampering with a Witness, Victim, or Informant, in violation of 18 U.S.C. §1512(b); (8) Conspiracy, in violation of 18 U.S.C. §§371 and 1349, and (9) Wire Fraud, in violation of 18 U.S.C. §1343. The items to be searched for and seized are described more particularly in Attachments B-1 through B-5 hereto.

4. As part of the investigation, I have reviewed documentation and reports provided by and discussed information with other officers involved in the investigation. For purposes of this Affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have hearsay knowledge.

1

5.      This Affidavit does not contain every fact known to the investigation, but only those deemed necessary to demonstrate sufficient probable cause to support the searches of the above noted information and devices (as described in Attachments A-1 through A-5).

6.      As a result of the instant investigation described more fully below, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of federal law, including 18 U.S.C. §§2312, 2313, 2314, 2315, 922(g), 1512(b), 371, 1349, and 1343 and 21 U.S.C. §844, are present within the above noted information and devices (as described in Attachment A-1 through A-5).

## JURISDICATION

7.      I make this Affidavit in support of Applications for search warrants under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for the following: (1) to obtain information about the location of the cellular telephone numbers, as described in Attachments A-1 and A-2, and (2) to authorize the examination of property described in Attachments A-3, A-4, and A-5, which are currently in law enforcement's possession.

8.      This court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND INFORMATION

### Technical Terms

9.      Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.   IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    b.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    c.   Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

    d.   Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line"

telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

e. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

f. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

g. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called "apps" or applications, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

<u>Electronic Storage and Forensic Analysis</u>

10. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the devices. This information can sometimes be recovered with forensics tools.

3

11. There is probable cause to believe that things that were once stored on the devices described in Attachments A-3, A-4, and A-5 may still be stored there, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

   d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

12. *Forensic evidence.* As further described in Attachments B-3, B-4, and B-5, the Applications seek permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems on computers and laptops can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

4

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

13. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the subject devices consistent with the warrants. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrants.

## Background on Wireless Providers

14. In my training and experience, I have learned that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. GPS data or latitude-longitude data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than GPS data or latitude-longitude data.

15. Based on my training and experience, I know that AT&T Wireless can collect GPS data or latitude-longitude data through a Mobile Locator Tool. Again in my experience, I know that T-Mobile can collect GPS data or latitude-longitude data through an E911 location data tool. I know that both AT&T Wireless and T-Mobile can collect cell-site data.

5

16. Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved. Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

17. Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

18. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

19. In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

6

## BACKGROUND OF INVESTIGATION AND PROBABLE CAUSE

### Introduction

20. From June 2015 to the present, MERLE LUNSFORD and his associates have been identified as suspects in thefts of numerous vehicles and other property from various locations in Ohio and Kentucky. Some of the stolen vehicles have been involved in hit-and-run traffic accidents, including one fatal accident occurring in Trotwood, Ohio.

21. By way of background, the investigation identified that prior to his arrest on October 30, 2015 (as detailed below), MERLE LUNSFORD resided at 3980 North Haven Way in Harrison Township, Ohio. The investigation identified that MERLE LUNSFORD's associates include the following individuals (among others):

   a. Michelle Lunsford is MERLE LUNSFORD's wife, and she currently resides at 3980 North Haven Way in Harrison Township, Ohio.

   b. Merle Lunsford II is MERLE LUNSFROD's son, and he currently resides at 3980 North Haven Way in Harrison Township, Ohio.

   c. Shane Lunsford is MERLE LUNSFORD's son, and he is currently incarcerated at the Montgomery County (Ohio) Jail.

   d. Charles Timothy Lunsford is MERLE LUNSFORD's brother, and he currently resides at 2246 Cardinal Avenue in Harrison Township, Ohio.

   e. Gilbert Lunsford, also known as "Red", is MERLE LUNSFORD's brother, and he resides in McKee, Kentucky.

   f. Joshua Jenkins is MERLE LUNSFORD's friend. Prior to his arrest on October 30, 2015 (as detailed below), Joshua Jenkins resided at 3980 North Haven Way in Harrison Township, Ohio.

   g. Nicholas Jenkins is an associate of MERLE JENKINS. His current residence has not been verified at this time.

### Recovery of Stolen Property, Firearms, and Electronic Devices

22. On or around June 15, 2015, an officer of the Glendale (Ohio) Police Department observed a 2007 Ford F350 truck pulling a 2004 Shadow Master trailer and driving northbound on State Route 4 in Glendale, Ohio. The officer noted that the trailer did not have any operational tail lights, and he attempted to conduct a traffic stop on the vehicle. The driver of the vehicle refused to stop, and a high-speed chase ensued. The trailer broke loose from the truck during the chase and crashed into an adjoining forested area. The officer lost the truck as the driver continued to flee, but it was located approximately one and a half hours later parked behind a business in Sharonville, Ohio.

   a. Officers identified the 2007 Ford F350 truck as having been reported as stolen from a residence in Champaign County, Ohio, and the 2004 Shadow Master trailer as having been reported as stolen from a residence in Montgomery County, Ohio. The truck had a license plate on it for another vehicle, and this license plate had been reported as stolen from a residence in Montgomery County, Ohio. Located on the trailer were a motor scooter, motorcycle, golf cart, and various tools and tires that were on the trailer at the time it was stolen. Also located on the trailer were two Polaris All-

Terrain Vehicles (ATV's) that had been reported as stolen from a residence in Preble County, Ohio. Various items were also located on the truck, including kitchenware that was stolen from a restaurant in Sharonville, Ohio the previous evening.

b. Nicholas Jenkins was subsequently located approximately one and a half hours later in Sharonville, Ohio by an officer of the Sharonville Police Department. The officer observed that Nicholas Jenkins was shirtless and sweating. Nicholas Jenkins asked the officer for a ride to a nearby Wal-mart store. After the officer observed the Ford F350 truck parked in a nearby location, Nicholas Jenkins was questioned by officers. Nicholas Jenkins made admissions that he had been in the Ford F350 truck during the said chase. He was arrested for receiving stolen property and failure to comply offenses. During an additional interview on the following day, Nicholas Jenkins stated that he was in the truck with MERLE LUNSFORD and Shane Lunsford during the chase and crash, and that MERLE LUNSFORD was driving the vehicle. Nicholas Jenkins was aware that the truck and the trailer had been previously stolen. He advised that he was with MERLE LUNSFORD and Shane Lunsford when they retrieved the truck from a stash location and stole the trailer, both from locations in Montgomery County, Ohio. Nicholas Jenkins stated that before the chase ensued, MERLE LUNSFORD and Shane Lunsford were attempting to dispose of the stolen truck and trailer in Kentucky, where they had family members.

23. On or around July 20, 2015, the Madison County (Kentucky) Sheriff's Office located a 2012 Ford F250 truck and a 2002 box utility trailer near a drainage ditch along the southbound lanes of Interstate 75. The vehicle and trailer had been abandoned and sustained significant damage. The responding deputy noted that the vehicle was packed full of car stereo equipment, power tools, and other items, and that the trailer contained a bicycle, power tools, crates of Christmas decorations, and other items. Based on the Vehicle Identification Number (VIN), the deputy determined that the truck had been recently reported as stolen from a residence in Darke County, Ohio, and the trailer had been reported as stolen from Montgomery County, Ohio.

a. Shortly after the vehicle and trailer were located, Nicholas Jenkins was located by a deputy walking approximately one and a half miles from the crash location. The deputy noted that Nicholas Jenkins was not wearing shoes and had sustained apparent injuries. During a subsequent interview, Nicholas Jenkins admitted that he had been in the truck when it crashed but denied knowing that it was stolen. Nicholas Jenkins stated that MERLE LUNSFORD was driving the vehicle at the time it crashed.

24. On or around August 30, 2015, officers of the Dayton (Ohio) Police Department responded to an incident in which MERLE LUNSFORD and Joshua Jenkins were found unconscious inside or next to a 2010 Chevrolet Silverado truck. Officers found Joshua Jenkins in the passenger seat of the vehicle and MERLE LUNSFORD next to the vehicle. A citizen reported that he had removed MERLE LUNSFORD from the driver's seat to perform medical aid. It appeared that both men had suffered a drug overdose, and they were thereafter transported by medic to a hospital for treatment. Although the vehicle had been reported as stolen from a residence in Miami County, Ohio, the responding officers did not recognize this fact because the vehicle had an improper license plate on it

8

(which was later identified as being stolen from another vehicle in Miami County, Ohio). Officers thereafter towed the vehicle to a local tow yard.

    a. On or around August 31, 2015, Joshua Jenkins went to the tow yard, identified himself as the owner of the vehicle, and requested to retrieve his personal items from the vehicle. An employee of the tow yard took Joshua Jenkins to the vehicle to look for the items. The employee reported that Joshua Jenkins apparently was unable to locate what he was looking for and left.

    b. On or around September 5, 2015, an employee of the tow yard reported that the said Chevrolet Silverado truck had been stolen from the tow lot. Surveillance footage identified that the vandals crashed the vehicle through a secured fence when exiting the lot.

    c. On or around September 29, 2015, the said Chevrolet Silverado truck was involved in a fatal hit-and-run car accident in Trotwood, Ohio. Surveillance footage identified that the truck failed to yield to oncoming traffic while making a left-hand turn at an intersection and struck another vehicle. The truck was later located abandoned a few blocks from the accident location. One of the occupants of the other vehicle died from injuries caused by the crash. Another occupant sustained significant injuries.

    d. During the following weeks, MERLE LUNSFORD and Joshua Jenkins were questioned regarding their involvement in this traffic accident. Both admitted that they were in the vehicle at the time of the overdose on August 30, 2015. MERLE LUNSFORD claimed that he had rented the truck from a "short black man" but denied knowing that it was stolen. Both MERLE LUNSFORD and Joshua Jenkins further stated that they were in the area of the September 29, 2015, accident, but they denied that they were in the vehicle. Both also denied being involved in the theft of the vehicle from the tow lot on September 5, 2015.

25.    On or around September 13, 2015, a resident in Montgomery County, Ohio reported to the Montgomery County Sheriff's Office that his 1998 Chevrolet Silverado truck and his friend's 2011 Bison trailer had been stolen from his residence. The trailer, which was attached to the truck, had a for sale sign on it. On or around September 13, 2015, officers of the Lakeside (Kentucky) Police Department recovered the said Chevrolet Silverado truck, which was abandoned along the southbound lanes of Interstate 75. On or around October 2, 2015, officers of the McKee (Kentucky) Police Department recovered the trailer, which was also found abandoned.

    a. During a subsequent police interview, the owner of the said truck advised that he had listed his friend's trailer for sale on the Facebook website. After seeing a photograph of MERLE LUNSFORD, the owner positively identified MERLE LUNSFORD as the individual who had come to the owner's residence to view the trailer shortly before the theft, posing as a potential buyer.

26.    On or around October 24, 2015, officers of the Butler Township (Ohio) Police Department responded to a traffic accident involving a 2004 Dodge Ram truck and another vehicle. The traffic investigation identified that the Dodge Ram truck struck another vehicle after failing to stop at a stop sign. The occupant(s) fled the accident scene prior to officers' arrival. The said Dodge Ram truck had an improper Ohio license

plate on it. Based on the VIN, officers determined that the vehicle had been stolen from a residence in Lincoln County, Kentucky. Among other items, officers located inside the truck two Ohio license plates (one of which had been reported as stolen from a trailer in Preble County, Ohio); a receipt from a Wal-mart store; and a bag containing bolt cutters, branch shears, a tow rope, and a chain.

a. As part of the investigation, deputies obtained surveillance footage from the Wal-mart store associated the receipt recovered from the vehicle. The surveillance footage identified that Shane Lunsford was the individual who conducted the purchase associated with the store receipt.

b. The owner of the Dodge Ram truck advised that two dirt bikes had been on the truck when it was stolen. The whereabouts of these dirt bikes were unknown at the time of the traffic accident.

c. During an interview, the owner of the Dodge Ram truck was asked about any relationship or knowledge she may have of Gilbert Lunsford. The owner stated that Gilbert Lunsford had recently purchased property from her father-in-law.

d. After the Dodge Ram truck was returned to the owner in Kentucky, the owner located a GPS device and photographs of children inside the vehicle that did not belong to her. When she turned on the GPS, she noted that it had a "home" address of 87 Pomeroy Avenue in Trotwood, Ohio. The vehicle owner turned the GPS and photographs over to the Montgomery County Sheriff's Office. The GPS device was identified as a **Garmin bearing serial number 145-01615-10**. It is currently being stored in the Evidence Room of the Montgomery County Sheriff's Office.

  i. The investigation identified that the address of 87 Pomeroy Avenue in Trotwood, Ohio is the address Shane Lunsford's girlfriend listed on her current Ohio driver's license. Shane Lunsford also identified this address as being his address when he was booked into the Montgomery County Jail on December 14, 2015 (as detailed below).

  ii. A detective of the Montgomery County Sheriff's Office reviewed the photographs as well as the public content of Shane Lunsford's Facebook account. The detective identified that children depicted in the photographs also appeared on Shane Lunsford's Facebook account.

27. On or around October 26, 2015, officers of the Vandalia (Ohio) Police Department located a 2014 GMC Sierra Z-71 truck that was severely burned and missing its hood and wheels. Officers determined that this vehicle had been reported as stolen approximately six days prior from a residence in Shelby County, Ohio.

28. On or around October 29, 2015, an owner of a tree cutting service in Montgomery County, Ohio reported that someone broke into his business and stole 10 heavy-duty chain saws. A cooperating witness told officers that he/she observed these chain saws in MERLE LUNSFORD's vehicle, which was then occupied by MERLE LUNSFORD, Joshua Jenkins, and another unknown white male. The cooperating witness heard MERLE LUNSFORD say that he was taking the chain saws to Kentucky. The cooperating witness later saw Joshua Jenkins in possession of a quantity of currency that was purportedly obtained from the sale of the chain saws.

29.    On or around October 28, 2015, a resident of Greene County, Ohio reported to the
       Greene County Sheriff's Office that his 2007 Ford F350 truck had been stolen from his
       residence during the overnight hours. The owner reported that the vehicle was locked,
       but that the keys to this and other vehicles parked on his property were left inside the
       vehicle. Also inside the vehicle were two cellular telephones and approximately $1,500
       in cash.

       a.  Later in the day, the owner of the said Ford F350 truck activated a tracking device on
           his cellular telephone. The tracking device identified that the telephone was located
           at 161 Pomeroy Avenue in Trotwood, Ohio. The owner thereafter traveled to this
           location and observed his truck parked outside of the residence. The owner heard
           males from inside the residence yell at him "we gonna take it again" (or words to that
           effect). The owner contacted the police department and vacated the area.

       b.  An officer of the Trotwood (Ohio) Police Department responded to the residence and
           observed the Ford F350 truck. While attempting to secure the scene, the officer
           observed two white males flee from the garage. Both males got into a grey Pontiac
           Aztek that was parked nearby. As the officer approached the vehicle, the male who
           was seated in the passenger seat fled on foot. The officer ordered the driver to exit
           the vehicle, but the driver fled in the vehicle. The officer was later able to identify
           the driver via photograph as MERLE LUNSFORD. Although the officer was not
           able to identify the license plate for the vehicle, it was determined that a grey Pontiac
           Aztek was registered to and driven by MERLE LUNSFORD.

       c.  Additional officers responded to 161 Pomeroy to process the scene. Officers noted
           that the Ford F350 truck had an improper license plate on it for another vehicle.
           Officers also located a 1992 Yamaha All-Terrain Vehicle (ATV) stored in the garage
           and a white box trailer parked behind the garage. The Yamaha ATV had been spray
           painted, and some of its identifying numbers had been scratched off. Based on the
           VIN, officers were able to determine that the Yamaha ATV had been previously
           stolen from a residence in Cuyahoga County, Ohio. The VIN to the white box trailer
           had been scratched off, so officers were not able to determine its owner. Based on
           my training and experience, I know that it is common for individuals involved in the
           thefts of vehicles and other property to paint them and obliterate the VIN's and serial
           numbers in an effort to conceal the thefts.

       d.  Diane Kane was identified as the resident of 161 Pomeroy Avenue, and she was
           contacted and interviewed. Diane Kane told officers that Shane Lunsford was her
           nephew, and that he had asked her for permission to use her garage a few days ago to
           change the oil on his truck. Diane Kane denied any ownership or knowledge of the
           Yamaha ATV, white box trailer, or the Ford F350 truck.

       e.  On the following day, Diane Kane told officers that she had located the two cellular
           telephones belonging to the owner of the Ford F350 truck inside her residence. An
           officer accompanied the owner to the residence to retrieve the telephones. Diane
           Kane granted the owner permission to search her garage for any additional items that
           might belong to him. The owner located clothing items, two tools, and an orange
           extension cord belonging to him that were previously in his vehicle at the time of the
           theft.

30.     On or around October 30, 2015, the owner of the said Ford F350 truck reported to the Greene County Sheriff's Office that his 2014 Polaris RTR ATV had been stolen from his residence. He noted that the keys to this ATV had been inside the Ford 350 truck when it was stolen, and the keys were not in the vehicle when it was recovered. Another nearby resident also reported to the Greene County Sheriff's Office on the same date that a number of tools and lawn equipment had been stolen from his residence.

31.     Also on or around October 30, 2015, the Boone County (Kentucky) Sheriff's Office contacted the Montgomery County Sheriff's Office. A deputy from the Boone County Sheriff's Office identified that the grey Pontiac Aztek registered to MERLE LUNSFORD had been found abandoned on the side of a road. The deputy requested that the Montgomery County Sheriff's Office check on MERLE LUNSFORD's well-being and inquire about the vehicle.

   a.   While a deputy of the Montgomery County Sheriff's Office was in route to MERLE LUNSFORD's residence (3980 North Haven Way in Harrison Township, Ohio), the Montgomery County Dispatch Center received a hang-up 911 call from the residence. Upon arrival, the deputy encountered Michelle Lunsford, who appeared visibly upset and stated that she was having a panic attack. Michelle Lunsford advised that her husband, MERLE LUNSFORD, physically assaulted her during an argument, and that he pointed a gun at her and threatened to kill her. Michelle Lunsford stated that MERLE LUNSFORD recently departed from the residence with Joshua Jenkins. She described the color of the gun, its caliber, and the holster containing it, as well as MERLE LUNSFORD's clothing. Michelle Lunsford stated that MERLE LUNSFORD had stolen the gun from Kentucky. Michelle Lunsford further reported that MERLE LUNSFORD had departed in a white truck that he said he stole from Kentucky. Michelle Lunsford stated that MERLE LUNSFORD and Joshua Jenkins had committed many crimes, including burning a truck in Vandalia. Michelle Lunsford completed a written statement for officers.

   b.   A short time later, the Montgomery County Sheriff's Office received a tip that MERLE LUNSFORD may be heading toward his brother's house located at 2246 Cardinal Avenue in Harrison Township, Ohio. A deputy responded to the residence and observed from a distance a white 1997 Chevrolet C15 truck turn into the driveway. When the deputy pulled up to the residence, no one was in the driver's seat of the vehicle. The deputy observed a white male exit the vehicle and run into the residence yelling "Merle, Merle".

   c.   The deputy waited for additional units to arrive. Charles Lunsford thereafter exited the residence and indicated that MERLE LUNSFORD and Joshua Jenkins had in fact entered and exited the residence. Charles Lunsford provided his consent for deputies to search his residence and outbuildings. Located in the garage were a Bobcat Zero-Turn Mower and a Redmax Weed Eater that were identified via their serial numbers as being stolen from a residence in Montgomery County, Ohio. When questioned about these items, Charles Lunsford advised that MERLE LUNSFORD had brought them to his house a few days prior and asked to store them there.

   d.   Deputies identified that the 1997 Chevrolet C15 truck that was parked in the driveway was recently reported as stolen from a residence in Grant County, Kentucky. Located in the vehicle in plain view was a black Hi-Point 9 mm Model C

12

pistol bearing serial number 008139, contained in a holster. This gun matched the description that Michelle Lunsford provided earlier that day to the deputy.

e. MERLE LUNSFORD was located a few hours later walking on foot a few blocks away from Charles Lunsford's residence. Located in his pants' pockets was a small key ring containing several lock picking tools and a small bag of suspected crystal methamphetamine. MERLE LUNSFORD was arrested for felonious assault and receiving stolen property offenses, and he has been incarcerated at the Montgomery County Jail since that time.

f. Later that afternoon, the Montgomery County Sheriff's Office received another tip that a stolen truck was located at 2703 Ontario Avenue in Harrison Township, Ohio. Deputies went to this residence and observed a 1994 Chevrolet C/K 2500 truck and a 2001 Ford F25 truck parked outside the residence. Both trucks had been reported as stolen from residences in Preble County, Ohio. Located inside the Chevrolet C/K 2500 truck were two Ohio license plates that had been reported as stolen. Located inside the Ford F25 truck were many of the tools that were stolen from the said residence in Greene County, Ohio on October 30, 2015.

g. Joshua Jenkins and Shane Lunsford were located inside the residence at 2703 Ontario Avenue, along with a number of other individuals. Located on Joshua Jenkins' person were approximately four capsules containing suspected heroin. During a subsequent interview, Joshua Jenkins admitted that he had been with MERLE LUNSFORD and another individual when they stole the said chain saws from the tree cutting service business. However, he denied going into the business at the time of the theft. Joshua Jenkins was thereafter arrested by deputies of the Montgomery County Sheriff's Office for a breaking and entering offense.

h. Again later in the afternoon, the Montgomery County Sheriff's Office received another anonymous tip that more stolen property was located at 3505 Idlewilde Boulevard in Dayton, Ohio. Officers recovered from a shed located on the property the 2014 Polaris RTR ATV that was stolen from the residence in Greene County, Ohio on October 29, 2015.

32. Since MERLE LUNSFORD's arrest, officers involved in the investigation have monitored the recorded telephone calls he made from the Montgomery County Jail. During a series of calls, MERLE LUNSFORD discussed having Charles Lunsford pick up and sell wheels and tires from his house, as well as having Shane Lunsford remove items from storage. Below are summaries of some of these calls:

a. During a call with Michelle Lunsford on November 2, 2015, MERLE LUNSFORD instructed her to tell Shane Lunsford to sell everything in "storage" as well as the tools that were in the garage.

b. During a call with Michelle Lunsford on November 9, 2015, MERLE LUNSFORD told her that Charles Lunsford would be coming over to get the wheels and tires from the "big truck". He instructed her to let Charles Lunsford have these items, as Charles Lunsford was doing something for him.

c. During a call with Charles Lunsford on November 10, 2015, MERLE LUNSFORD said that the wheels and tires were brand new and asked Charles Lunsford to try to sell them for $400. MERLE LUNSFORD said that Charles Lunsford could keep $50 to $100 from the sale but asked that the remainder be put on MERLE LUNSFORD's

account at the jail. Charles Lunsford inquired about where MERLE LUNSFORD obtained the wheels and tires from, and MERLE LUNSFORD did not respond. Based on my training and experience, it appeared to me that MERLE LUNSFORD was cognizant of the fact that the telephone call was being recorded and therefore did not want to discuss from where the wheels and tires were obtained.

d. During a call with Merle Lunsford II later in the day on November 10, 2015, MERLE LUNSFORD said that Charles Lunsford would be coming over to get the wheels and tires. MERLE LUNSFORD told Merle Lunsford II to tell Charles Lunsford where the wheels and tires came from, as Charles Lunsford had asked about them.

33.    On November 10, 2015, after monitoring the above noted telephone calls, a detective from the Montgomery County Sheriff's Office observed a truck containing wheels and tires on the back of it parked at Charles Lunsford's residence. The detective contacted Charles Lunsford and inquired about the items. Charles Lunsford stated that he had picked them up from MERLE LUNSFORD's house, and that he was supposed to sell them for MERLE LUNSFORD. The detective noted that the make, model, and style of the wheels and tires were consistent with those from the vehicle that was found burned in Vandalia, Ohio. The items were seized for further examination.

34.    Charles Lunsford also told the detective that MERLE LUNSFORD's garage contained a number of stolen items, including two dirt bikes from Kentucky. The detective and other deputies then contacted Michelle Lunsford at the residence, and she provided her consent for deputies to search the garage. Because the garage was locked, Merle Lunsford II first climbed through a window and opened the garage door for deputies. Located in the garage were the two dirt bikes that were on the 2004 Dodge Ram truck when it was stolen from the residence in Lincoln County, Kentucky.

35.    Further monitoring of MERLE LUNSFORD's jail calls identified that he discussed on a number of occasions the seizure of the wheels and tires and the two dirt bikes. MERLE LUNSFORD stated during the calls that he had purchased the wheels and tires and that the dirt bikes belonged to Shane Lunsford. Based on my training and experience, I know that many individuals who make calls from jails and prisons are aware that the calls are recorded and monitored by law enforcement officers. They therefore make false statements about their criminal culpability in an effort to mislead law enforcement officers. They also make such false statements in an effort to let others know what they intend to use as their criminal defense or alibi so that the other individuals will make consistent statements. Below are summaries of some of the conversations about the wheels and tires and dirt bikes:

a. On November 11, 2015, MERLE LUNSFORD talked to Charles Lunsford about the seizure of the wheels and tires. During this call, MERLE LUNSFORD said that he purchased the items from someone named "Jody Johnson" for $250.

b. On November 12, 2015, MERLE LUNSFORD talked to Gilbert Lunsford about the wheels and tires. MERLE LUNSFORD again said that he purchased the items from Jody Johnson. MERLE LUNSFORD also told Gilbert Lunsford that officers had located two dirt bikes from his house that were stolen from Kentucky. MERLE LUNSFORD said that these bikes belonged to Shane Lunsford. When asked where the bikes were stolen from, MERLE LUNSFORD responded that they were from a location that was nowhere near Gilbert Lunsford's residence. Based on the context of

the conversation, it appeared that MERLE LUNSFORD had specific knowledge of the location of the theft.

    c. On November 15, 2015, MERLE LUNSFORD talked to Merle Lunsford II about the dirt bikes. MERLE LUNSFORD stated that he told the "stupid mother fucker" not to bring the dirt bikes back to the house but rather to get rid of them for whatever he could get. Based on the context of this conversation and previous calls, it appeared that MERLE LUNSFORD was referring to his instructions for Shane Lunsford to retrieve the dirt bikes from storage and sell them. MERLE LUNSFORD again made statements indicating that the dirt bikes belonged to Shane Lunsford, and he asked if Merle Lunsford II told this to the officers.

36. The wheels and tires seized from Charles Lunsford were sent to General Motors for examination. A representative from General Motors positively identified that the tires were previously on the 2014 GMC Sierra Z-71 truck that was found burned in Vandalia, Ohio.

37. During other calls made by MERLE LUNSFORD from the Montgomery County Jail, he discussed what is believed to be his connection to an additional firearm. Based on the context of the conversations and my training and experience, I believe that MERLE LUNSFORD was asking Michelle Lunsford and Merle Lunsford II to "wipe down" this gun to remove his DNA and fingerprints to conceal his connection to the gun. Below are summaries of some of the calls:

    a. On November 12, 2015, Michelle Lunsford said that Merle Lunsford II found behind a work bench an item that MERLE LUNSFORD thought was "lost". MERLE LUNSFORD instructed Michelle Lunsford to "put it up and hide it", to "take it and wipe it down", and to put it in her drawer in the bedroom. MERLE LUNSFORD said that Michelle Lunsford was not a convicted felon, so it did not matter if she had this item.

    b. Later on November 12, 2015, MERLE LUNSFORD told Charles Lunsford that Michelle Lunsford had found what he thought someone had stolen from his garage. MERLE LUNSFORD referred to this item as a "bang bang". Based on my training and experience, I know that "bang bang" is a slang term that individuals have used to refer to firearms.

    c. On November 15, 2015, MERLE LUNSFORD talked to Merle Lunsford II. During the call, MERLE LUNSFORD said, "That other thing you found of mine, that other thing that you found of mine, too, get that from her and put it up." Merle Lunsford II responded, "I have it". MERLE LUNSFORD began to ask Merle Lunsford II a question, but the jail's calling system terminated the call.

38. On November 19, 2015, a search warrant was authorized by the Vandalia (Ohio) Municipal Court for MERLE LUNSFORD's 3980 North Haven Way residence in Harrison Township, Ohio. The warrant authorized officers to search for and seize any weapons, suspected stolen property, and electronic devices. Among other items, the following were seized:

    a. Silver .38 caliber Smith and Wesson CTGE pistol bearing serial number 153358, found in a bag in a basement closet and wrapped in paper

 b. Black gun case containing a Mossberg 12-gauge shotgun bearing serial number L376790 and a crack shot 26 lever action rifle, found in a basement closet

 c. Eight cellular telephones and tablets, located in the basement, described as:

  i. Kyocera cellular telephone, Model C5215 (no visible serial number)

  ii. Huawei cellular telephone, Model U8500, serial number (S/N) P5K7NA1261100087

  iii. Motorola Razor cellular telephone, S/N SJUG2147DK

  iv. Apple iPhone, FCC#BCG-E2599A

  v. Apple iPhone, FCC#BCG-A1303B

  vi. Apple iPhone, FCC#BCG-E2599A

  vii. Cricket ZTE cellular telephone (no visible serial number)

  viii. Apple iPad, S/N F9GN8DJ8F196

 d. HP laptop computer bearing serial number 5C0444DGF4, found in the Master Bedroom

 e. Nine cellular telephones and tablets, found in the Master bedroom, described as:

  i. LG tablet

  ii. HTC cellular telephone, S/N FAA49TSR14682

  iii. LG cellular telephone, S/N 205KPTM0483393

  iv. Samsung cellular telephone, DEC number 268435460208229767

  v. Samsung cellular telephone, S/N 02212905459

  vi. LG Tracfone, S/N 912CQYQ748746

  vii. LG Net10 cellular telephone, 806CQPY643520

  viii. Samsung T-Mobile cellular telephone, S/N R21D754TXGW

  ix. Samsung Verizon cellular telephone, S/N SMB311VZPP

39. Merle Lunsford II was present during the search and identified that his bedroom was in the basement. When questioned about the guns found in the basement, Merle Lunsford II in summary provided the following information:

 a. Merle Lunsford II identified that the rifle and shotgun belonged to him.

 b. Merle Lunsford II first denied any knowledge of the silver Smith and Wesson pistol. However, he later admitted he found this pistol in the garage on the day that he crawled into the window and unlocked the garage for officers (on November 10, 2015, as detailed above). Merle Lunsford II said that he concealed this gun because he did not want officers to charge MERLE LUNSFORD with possessing it. Merle Lunsford II denied having any knowledge of who owned the gun or how it got into the garage.

40. In December 2015, deputies of the Montgomery County Sheriff's Officers were searching for Shane Lunsford related to an outstanding arrest warrant in Preble County, Ohio. On or around December 14, 2015, after receiving a tip regarding his whereabouts, deputies located Shane Lunsford at a residence located on Brohm Lane in Dayton, Ohio standing next to a white 2005 Chevrolet Silverado truck. When deputies approached him, Shane Lunsford fled on foot but was apprehended after a short foot chase. Deputies

determined that the white Chevrolet Silverado truck had been reported as stolen from Montgomery County, Ohio. Deputies also located a blue 2005 Chevrolet Suburban in the back of the residence which had been reported as stolen from Preble County, Ohio. The blue Chevrolet Suburban was involved during previous weeks in a vehicle chase in Moraine, Ohio when an officer attempted to make a traffic stop. Although the driver was able to flee prior to being stopped, the officer involved in the chase positively identified the driver as Shane Lunsford.

a. The owner of the residence stated that he operated a vehicle repair business from the residence. The owner told deputies that Shane Lunsford had brought both the Chevrolet Silverado truck and the Chevrolet Suburban to the residence to be repaired.

b. In performing an inventory search of the vehicle, deputies located in the Chevrolet Silverado truck (among other items) a black bag containing a small baggy of suspected heroin, a small baggie of suspected methamphetamine, a spoon with residue, two syringes, and empty gel caps.

c. After Shane Lunsford was arrested, he was advised of his Miranda rights and consented to be interviewed. Shane Lunsford admitted that he had been driving the Chevrolet Silverado truck and the Chevrolet Suburban and knew the vehicles were stolen, but he would not identify how he obtained the vehicles. Shane Lunsford was then asked about the 2004 Dodge Ram truck that had been reported as stolen from Lincoln County, Kentucky and that was involved in a traffic accident in Butler Township, Ohio. Shane Lunsford first denied knowledge of this truck. Later in the interview, he stated that he purchased the truck for $500 but knew it had been stolen. Shane Lunsford stated that he was addicted to heroin and methamphetamine, and that the drugs found in the black bag in the Chevrolet Silverado truck belonged to him.

d. Seized from Shane Lunford's person pursuant to his arrest was an **Alcatel One Touch cellular telephone bearing Model 5054N and IMEI 014451001214013**. This device is currently in the Evidence Room of the Montgomery County Sheriff's Office and has not been accessed by officers since it was seized.

## Tampering with a Witness, Victim or Informant

41. Since October 30, 2015, Michelle Lunsford has changed her statement regarding the facts and circumstances as to what happened before MERLE LUNSFORD fled in the Chevrolet C15 truck on the day of his arrest (as detailed above). Michelle Lunsford has subsequently told officers that the subject gun belonged to Joshua Jenkins. She now claims that MERLE LUNSFORD did not point the gun at her or threaten her with it, but that he merely picked it up when he was with Joshua Jenkins. During some of the recorded jail calls with MERLE LUNSFORD, Michelle Lunsford denied making certain statements to police officers. Based on my training and experience, I know that it is common for victims of domestic violence to recant or change their statements regarding their abusers. They may do so both because of their feelings of affection toward their abusers and/or because of threats or pressure that the abusers place on them.

42. The recorded telephone calls from the Montgomery County Jail identified numerous instances in which MERLE LUNSFORD appeared to be attempting to improperly influence Michelle Lunsford's testimony regarding his involvement with the gun that was

seized on the day of his arrest and other matters. Below are summaries of a few of these telephone calls:

a.  On August 31, 2015, MERLE LUNSFORD talked to Charles Lunsford. MERLE LUNSFORD began the conversation by asking Charles Lunsford to tell "little Merle" (referring to Merle Lunsford II) and Michelle Lunsford that "it" was not his gun. MERLE LUNSFORD also said that he needed someone to talk to Michelle Lunsford and tell her to say that she did not feel threatened by him or that she was dreaming what happened. MERLE LUNSFORD said that Michelle Lunsford needed to say things that would damage her credibility.

b.  On November 4, 2015, MERLE LUNSFORD talked to Charles Lunsford. MERLE LUNSFORD said that he needed to be "cool" with Michelle Lunsford because he did not want her "running her mouth". Later in the conversation, MERLE LUNSFORD asked Charles Lunsford to explain to Michelle Lunsford that she should not show up to court under any circumstances, even if she was subpoenaed or taken to jail.

c.  On November 9, 2015, MERLE LUNSFORD told Michelle Lunsford to "quit talking to the Sheriff's" and to not say anything to anyone else. He then asked if she wrote the letter he told her to write. He asked if the letter said that she lied about what she said about him because she thought he needed drug treatment. Michelle Lunsford confirmed that she wrote this letter.

d.  On November 11, 2015, MERLE LUNSFORD talked to Charles Lunsford. MERLE LUNSFORD said that he had been "buttering up" Michelle Lunsford so that she would "keep her mouth shut".

43.  The recorded telephone calls from the Montgomery County Jail identified numerous instances in which MERLE LUNSFORD appeared to be attempting to unduly influence Joshua Jenkins' testimony. MERLE LUNSFORD stated on numerous occasions that the gun found on the day of his arrest belonged to Merle Lunsford II, and that Joshua Jenkins had obtained the gun from Merle Lunsford II earlier that day. Below are summaries of a few of these telephone calls:

a.  On August 31, 2015, MERLE LUNSFORD talked to Charles Lunsford. MERLE LUNSFORD said that Joshua Jenkins did not have a felony conviction so could not be charged with a weapons under disability offense. MERLE LUNSFORD asked for Charles Lunsford to tell Joshua Jenkins to say that the gun was his. MERLE LUNSFORD also said that he needed to know what Joshua Jenkins was telling officers.

b.  On November 2, 2015, MERLE LUNSFORD talked to Michelle Lunsford. MERLE LUNSFORD said that he needed "little Merle" (referring to Merle Lunsford II) to visit Joshua Jenkins at the jail and to tell him to say that the gun belonged to him. MERLE LUNSFORD also asked for someone to talk to Joshua Jenkins and tell him to say that MERLE LUNSFORD purchased the 1997 Chevrolet C15 truck for $1,500.

c.  On November 12, 2015, MERLE LUNSFORD talked to Gilbert Lunsford. Gilbert Lunsford said that he wrote a letter to Joshua Jenkins and told Joshua Jenkins to say that the gun was his.

d.  On November 9, 2015, MERLE LUNSFORD talked to Shane Lunsford. MERLE LUNSFORD said that he suspected that some of Shane Lunsford's associates were

cooperating with police officers and providing information about Shane Lunsford's activities. MERLE LUNSFORD stated, "do no tell none of them guys nothing else about uh about what we did one night". MERLE LUNSFORD then said that "Josh is keeping his mouth shut and everyone is keeping their mouth shut".

### Additional Information on Controlled Substances

44. MERLE LUNSFORD admitted in several of the recorded telephone calls that the methamphetamine that was seized from him pursuant to his arrest belonged to him. For example, on November 2, 2015, MERLE LUNSFORD said that he had purchased one-quarter gram of methamphetamine around the time that he supposedly purchased the stolen 1997 Chevrolet C15 truck. On November 12, 2015, MERLE LUNSFORD told Gilbert Lunsford that officers had found methamphetamine in his pocket at the time of his arrest. MERLE LUNSFORD said that he had forgotten he had this methamphetamine.

45. The suspected methamphetamine that was seized from MERLE LUNSFORD on October 30, 2015, was sent to the Miami Valley Regional Crime Laboratory for analysis. The analysis identified that the substance weighed approximately 0.28 grams and contained methamphetamine.

46. The suspected heroin and methamphetamine that was seized from the 2005 Chevrolet Silverado truck on the day of Shane Lunsford's arrest (December 14, 2015) was sent to the Miami Valley Regional Crime Laboratory for analysis. Results have not been received to-date.

### Additional Information on Pistols

47. The Hi-Point 9 mm Model C pistol that was seized from the 1997 Chevrolet C15 truck on October 30, 2015, was sent to the Miami Valley Regional Crime Laboratory. A forensic firearms analyst test-fired the gun and identified that it was operational

48. Records from the Bureau of Alcohol, Tobacco, and Firearms identified that the Hi-Point 9 mm Model C pistol was sold by the Gold 'N' Guns dealership in Danville, Kentucky to an individual residing in Harrodsburg, Kentucky on or about October 19, 1996. Therefore, this weapon traveled in interstate commerce prior to being possessed in Ohio.

49. Based on my training and experience, I know that Smith and Wesson pistols are not manufactured in the state of Ohio. Therefore, I believe that the aforesaid silver .38 caliber Smith and Wesson CTGE pistol seized from MERLE LUNSFORD's residence traveled in interstate commerce prior to be possessed in Ohio.

### Identification of Cellular Telephone Numbers

50. During his arrest on October 30, 2015, MERLE LUNSFORD acknowledged that his cellular telephone number was **937-641-9736**. Records checks identified that this telephone number was serviced by T-Mobile.

51. At the time of his arrest on October 30, 2015, MERLE LUNSFORD was in possession of a notebook containing various addresses and telephone numbers. This notebook had a listing for "Josh" with a telephone number of **937-838-8173**. Records from the Butler Township (Ohio) Police Department established that Joshua Jenkins was involved in a

traffic accident on or around June 26, 2015. During officers' investigation of this accident, Joshua Jenkins acknowledged that his telephone number was **937-838-8173**. I therefore believe that Joshua Jenkins is the user of telephone number **937-838-8173**. Records checks identify that the number was serviced by T-Mobile.

52. The notebook seized from MERLE LUNSFORD also had a listing for "Shane" with a telephone number of **937-430-7982**. Next to this listing is another listing for "Shane's Mom". In addition, when the **Alcatel One Touch cellular telephone bearing Model 5054N and IMEI 014451001214013** was seized from Shane Lunford's person pursuant to his arrest. At this point, a detective of the Montgomery County Sheriff's Office dialed telephone number **937-430-7982**. The said cellular telephone seized from Shane Lunsford rang, indicating that telephone number **937-430-7982** was assigned to this device. I therefore believe that Shane Lunsford is the user of telephone number **937-430-7982**. Records checks identified that this telephone number is serviced by T-Mobile.

53. When Charles Lunsford was interviewed by officers on October 30, 2015 (as detailed above), he completed a written statement where he identified that his telephone number was **937-559-6115**. Records check identified that this telephone number was serviced by AT&T Wireless.

## Evidence Available from Wireless Telephone Providers

54. Based on my training and experience, I know that cell tower and sector information and GPS or latitude-longitude data can be materially relevant in investigations involving interstate theft, firearms, and drug offenses. This information provides evidence of the types of travels taken by offenders when engaging in the criminal activities and helps in determining whether or not a subject or witness was at the scene of a crime. Data regarding the subjects' or witness' whereabouts obtained from cell site information can corroborate statements and provide evidence of the locations of the criminal activities.

55. In my experience, transactional information maintained by telephone providers is often relevant in criminal investigations of interstate theft, controlled substances, and firearms offenses. Information such as the telephone numbers associated with incoming and outgoing calls and text messages can help in identifying other co-conspirators.

56. Also based on my training and experience, I know that subscriber information, billing records, and customer service records maintained by telephone providers is materially relevant in criminal investigations in which telephones are used in the commission of the criminal offenses. Such information is significant in that it helps in determining the identities of the users of the telephones.

## Evidence Available from Electronic Devices

57. Based on my training and experience, I know that individuals involved in interstate theft, firearms, and drug offenses often use a variety of electronic devices in the commission of the offenses. Offenders utilize laptop computers, cellular telephones, and tablets (such as those described in Attachments A-3 and A-4) to communicate with co-conspirators about various aspects of the criminal activities. Such communications include, among others, coordinating the theft, transportation, and sale of the stolen items; discussing use of the stolen items; coordinating the purchase and receipt of narcotics; and discussing the use of firearms. The communications may be in various forms, including telephone calls, text

messages, email communications, and Internet and cellular telephone-based messenger applications

58.    Again based on my training and experience, I know that offenders often utilize laptop computers, cellular telephones, and tablets to conduct Internet searches related to their criminal activities. Such Internet searches may include searching for maps and directions to the locations of the criminal activities (such as locations of the thefts, locations of purchases of controlled substances, and locations where firearms are purchased or used), conducting research for locations where possible thefts could take place, researching the retail value of vehicles and other stolen items, researching types and values of firearms, and researching controlled substances.

59.    In my experience, I know that most cellular telephones and tablets have digital cameras and video recording devices. Offenders sometimes use these cameras and video recorders to take pictures and videos of the stolen vehicles, their controlled substances, and their firearms. Offenders may also photograph and video record their surroundings during the times that the criminal activities took place and/or during their travels to these locations. In my experience, individuals sometimes download the pictures they take on their cellular telephones and tablets onto their computers and laptops for storage. Such photographs and video recordings can be useful in determining the locations of criminal activities.

60.    I also know, in my experience, that many cellular telephones and tablets can connect to the wireless Internet service of residences and businesses that the users' frequent. I know that some cellular telephones and tablets have GPS devices. The IP addresses and the GPS information stored on the devices can be materially relevant in determining the locations of criminal activities and the travels to get to these locations.

61.    Based on my training and experience, I know that individuals often utilize GPS devices such as the Garmin described in Attachment A-5 when traveling by vehicle to find their locations. I also know that forensic tools can be used to retrieve historical data from GPS devices regarding previous travels. Such information is materially relevant in investigations involving interstate thefts, firearms, and controlled substance offenses in that it provides information regarding the locations of criminal activities and the travels taken to get to these locations.

## CONCLUSION

62.    Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the following criminal offenses may be located on or in the information and devices described Attachments A-1 through A-5: (1) Interstate Transportation of Stolen Vehicles, in violation of 18 U.S.C. §2312; (2) Interstate Sale or Receipt of Stolen Vehicles, in violation of 18 U.S.C. §2313; (3) Interstate Transportation of Stolen Goods, in violation of in violation of 18 U.S.C. §2314; (4) Interstate Sale or Receipt of Stolen Goods, in violation of 18 U.S.C. §2315; (5) Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §922(g); (6) Possession of Controlled Substances, in violation of 21 U.S.C. §844; (7) Tampering with a Witness, Victim, or Informant, in violation of 18 U.S.C. §1512(b); (8) Conspiracy, in violation of 18 U.S.C. §§371 and 1349, and (9) Wire Fraud, in violation of 18 U.S.C. §1343.

63.   I therefore respectfully request that attached warrants be issued authorizing the searches and seizure of the items listed in Attachments B-1 through B-5.

64.   Because the warrants for the accounts described in Attachments A-1 and A-2 will be served on AT&T Wireless and T-Mobile, who will then compile the requested records at times convenient to those entities, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

65.   Because the warrants for the electronic devices described in Attachments A-3, A-4, and A-5 seek only permission to examine devices already in law enforcement's possession, the execution of the warrants does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.


Special Agent Andrea R. Kinzig
Federal Bureau of Investigation


SUBSCRIBED and SWORN
before me this ___7th___ of January 2016

Sharon L. Ovington
CHIEF UNITED STATES MAGISTRATE JUDGE

22